



IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

VINCENT P. ANGIOLILLO, individually and
on behalf of all others similarly situated,

                              Plaintiff,

v.

JEFFREY   S.   LITWIN,   JOEL
MORGANROTH, STEPHEN S. PHILLIPS,
KLAUS P. BESIER, GERALD A. FAICH,
ELAM M. HITCHNER, STEPHEN M.
SCHEPPMANN, GENSTAR CAPITAL LLC,
GENSTAR CAPITAL PARTNERS VI, L.P.,
EXPLORER HOLDINGS, INC., EXPLORER
ACQUISITION CORP., and ERESEARCH
TECHNOLOGY, INC.,

                          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Civil Action No.:**

**JURY TRIAL DEMANDED**

**FILED**

MAY 21 2012

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

## CLASS ACTION COMPLAINT
## FOR BREACH OF FIDUCIARY DUTY

Plaintiff, by his attorneys, alleges upon information and belief, except for his own acts,
which are alleged on knowledge, as follows:

1.      Plaintiff brings this class action on behalf of the public stockholders of eResearch
Technology, Inc. ("ERT" or the "Company") against ERT's Board of Directors (the "Board" or
the "Individual Defendants") for their breaches of fiduciary duties arising out of the Board's
attempt to sell the Company to Genstar Capital LLC ("Genstar"). Plaintiff also brings this action
individually against ERT's Board for their violations of Section 14(a) of the Securities Exchange
Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder ("Rule 14a-9").

2.      On April 10, 2012, the Company and Genstar announced a definitive agreement under which Genstar, through its affiliates Genstar Capital Partners VI, L.P. ("Genstar VI"), Explorer Holdings, Inc. ("Explorer") and Explorer Acquisition Corp. ("Merger Sub"), will acquire all of the outstanding shares of ERT for $8.00 per share in cash (the "Proposed Transaction"). The Proposed Transaction is valued at approximately $393 million.

3.      The Proposed Transaction, however, is unfair to ERT's shareholders, does not offer them adequate consideration, was the result of an unfair sales process, and is going to be effected through the dissemination of a materially false and misleading proxy statement, as demonstrated by the Preliminary Proxy Statement filed by ERT on May 9, 2012 (the "Proxy").

4.      The Board has breached its fiduciary duties by agreeing to the Proposed Transaction for inadequate consideration. As described in more detail below, the $8.00 per share consideration shareholders will receive is inadequate. In fact, as detailed herein, the Company's own financial advisor, J.P. Morgan Securities, LLC ("J.P. Morgan"), valued the Company as high as $12.65 per share.

5.      The Proposed Transaction will result in very lucrative arrangements for the Company's officers and directors described in more detail below, including: (a) employment arrangements for the Company's management with the post-merger Company; (b) the establishment of equity-based incentive compensation plans for ERT management following the Proposed Transaction; (c) the opportunity for ERT management to exchange, simultaneously with the consummation of the Proposed Transaction, the outstanding common stock held by them for shares of common stock in the post-merger company; and (d) substantial payments to the Company's officers and directors resulting from the vesting of previously restricted and unvested stock options.

6.   The Board's decision to enter into the Proposed Transaction was a product of efforts to provide Company insiders and directors with preferential treatment at the expense of the public shareholders, which is unlawful and a breach of defendants' fiduciary duties to the Company's public shareholders.   As described below, the Board agreed to the Proposed Transaction after conducting a flawed and unfair sales process, tailoring the sales process so as to ensure that it resulted in lucrative benefits for themselves, while the interests of ERT shareholders' were cast aside.

7.   The Individual Defendants have exacerbated their breaches of fiduciary duty by agreeing to lock up the Proposed Transaction with deal protection devices that preclude other bidders from making a successful competing offer for the Company.   Specifically, pursuant to the merger agreement dated April 9, 2012 (the "Merger Agreement"), defendants agreed to: (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirers or even in continuing discussions and negotiations with potential acquirers; (ii) a provision that provides Genstar with four business days to match any competing proposal in the event one is made; and (iii) a provision that requires the Company to pay Genstar a termination fee of $11 million in order to enter into a transaction with a superior bidder. These provisions substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives including a sale of all or part of ERT.

8.   In connection with the Proposed Transaction, on May 9, 2012, the Company filed the Proxy with the SEC.   The Proxy fails to provide the Company's shareholders with material information and provides them with materially misleading information thereby rendering the shareholders unable to make an informed decision regarding whether to vote in favor of the Proposed Transaction. Defendants have violated Section 14(a) of the Exchange Act and Rule

14a-9 promulgated thereunder, by omitting material facts necessary to render the Proxy non-misleading. Defendants have also breached their fiduciary duty of candor by failing to disclose material information to the ERT shareholders necessary for them to determine whether to vote in favor of the Proposed Transaction. The misrepresentations and omissions in the Proxy are material to Plaintiff and the class he seeks to represent. Without this information, Plaintiff and the other ERT shareholders will be deprived of their entitlement to make an informed decision on whether to vote in favor of the Proposed Transaction should these misrepresentations and omissions not be cured prior to the shareholder vote on the Proposed Transaction.

9.      The Individual Defendants have breached their fiduciary duties of loyalty, due care, independence, good faith and fair dealing, and ERT, Genstar, Genstar VI, Explorer, and Merger Sub have aided and abetted such breaches by ERT's officers and directors. Plaintiff seeks to enjoin the Proposed Transaction unless and/or until defendants cure their breaches of fiduciary duty.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), as this Complaint alleges violations of Section 14(a) of the Exchange Act and Rule 14a-9. This court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

11.     This action is not a collusive one to confer jurisdiction on a court of the United States, which it would otherwise not have.

12.     Venue is proper in this district because defendant ERT maintains its principal executive offices in the district and the defendants have conducted business and engaged in numerous activities, which have had an effect on this district.

13.     Venue is proper in this district because a substantial portion of the transactions and wrongs alleged herein occurred in this district.

## PARTIES

14.     Plaintiff is, and has been at all relevant times, the owner of shares of common stock of ERT.

15.     ERT is a corporation organized and existing under the laws of the State of Delaware. It maintains its principal executive offices at 1818 Market Street, Philadelphia, Pennsylvania, 19103. ERT is a global technology-driven provider of services and customizable medical devices, primarily to biopharmaceutical organizations and healthcare organizations.

16.     Defendant Jeffrey S. Litwin ("Litwin") has been President, Chief Executive Officer and a director of the Company since May 2011.

17.     Joel Morganroth ("Morganroth") has been a director of the Company since 1997, and Chief Scientific Officer of the Company since 2006. Morganroth previously served as Chief Executive Officer from 1993 to 2001 and Chief Scientist from 2001 to 2005.

18.     Defendant Elam M. Hitchner ("Hitchner") has been a director of the Company since 2004.

19.     Defendant Gerald A. Faich ("Faich") has been a director of the Company since 2004.

20.     Defendant Stephen S. Phillips ("Phillips") has been a director of the Company since 2002.

21.     Defendant Stephen M. Scheppmann ("Scheppmann") has been a director of the Company since 2006.

22. Defendant Klaus Besier ("Besier") has been a director of the Company since 2010.

23. Defendants referenced in ¶¶ 16 through 22 are collectively referred to as Individual Defendants and/or the Board.

24. Defendant Genstar is a Delaware limited liability company with its headquarters located at Four Embarcadero Center, Suite 1900, San Francisco, California 94111. Genstar is a private equity firm that invests in leading middle-market companies in the life sciences, healthcare services, software and software services, financial services and industrial technology industries.

25. Defendant Genstar VI is Delaware limited liability company and an affiliate of Genstar.

26. Defendant Explorer is a Delaware corporation with its headquarters located at Explorer Holdings, Inc. c/o Genstar Capital LLC, Four Embarcadero Center, Suite 1900, San Francisco, California 94111. Explorer is affiliated with defendant Genstar.

27. Defendant Merger Sub is a Delaware corporation wholly owned by Explorer that was created for the purposes of effectuating the Proposed Transaction.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

28. By reason of the Individual Defendants' positions with the Company as officers and/or directors, they are in a fiduciary relationship with Plaintiff and the other public shareholders of ERT and owe them, as well as the Company, a duty of care, loyalty, good faith, candor, and independence.

29. To diligently comply with their fiduciary duties, the Individual Defendants may not take any action that:

(a)     adversely affects the value provided to the corporation's shareholders;

(b)     favors themselves or will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)     adversely affects their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

(d)     will provide the Individual Defendants with preferential treatment at the expense of, or separate from, the public shareholders.

30.     In accordance with their duties of loyalty and good faith, the Individual Defendants are obligated to refrain from:

(a)     participating in any transaction where the Individual Defendants' loyalties are divided;

(b)     participating in any transaction where the Individual Defendants receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

(c)     unjustly enriching themselves at the expense or to the detriment of the public shareholders.

31.     Defendants also owe the Company's stockholders a duty of candor, which includes the disclosure of all material facts concerning the Proposed Transaction and, particularly, the fairness of the price offered for the stockholders' equity interest. Defendants are knowingly or recklessly breaching their fiduciary duty of candor by failing to disclose all material information concerning the Proposed Transaction, and/or aiding and abetting other Defendants' breaches.

32.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, are knowingly or recklessly violating their fiduciary duties, including their duties of care, loyalty, good faith, candor, and independence owed to plaintiff and other public shareholders of ERT.

## CLASS ACTION ALLEGATIONS

33.     Plaintiff brings this action on its own behalf and as a class action on behalf of all owners of ERT common stock and their successors in interest, except Defendants and their affiliates (the "Class").

34.     This action is properly maintainable as a class action for the following reasons:

(a)     the Class is so numerous that joinder of all members is impracticable. As of April 12, 2012, ERT has approximately 49.24 million shares outstanding.

(b)     questions of law and fact are common to the Class, including, *inter alia*, the following:

(i)     Whether the Individual Defendants breached their fiduciary duties of undivided loyalty, independence, or due care with respect to Plaintiff and the other members of the Class in connection with the Proposed Transaction;

(ii)    Whether the Individual Defendants breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Transaction;

(iii)    Whether the Individual Defendants misrepresented and omitted material facts in violation of their fiduciary duties owed by them to Plaintiff and the other members of the Class;

(iv)    Whether the Individual Defendants breached any of their other fiduciary duties to plaintiff and the other members of the Class in connection with the Proposed Transaction, including the duties of good faith, diligence, honesty and fair dealing;

(v)    Whether the Individual Defendants, in bad faith and for improper motives, impeded or erected barriers to discourage other strategic alternatives including offers from interested parties for the Company or its assets;

(vi)    Whether Plaintiff and the other members of the Class would be irreparably harmed were the transaction complained of herein consummated.

(vii)    Whether ERT, Genstar, Genstar VI, Explorer, and Merger Sub aided and abetted the Individual Defendants' breaches of fiduciary duty; and

(viii)    Whether the Class is entitled to injunctive relief or damages as a result of Defendants' wrongful conduct.

(c)    Plaintiff is committed to prosecuting this action, is an adequate representative of the Class, and has retained competent counsel experienced in litigation of this nature.

(d)    Plaintiff's claims are typical of those of the other members of the Class.

9

(e)      Plaintiff has no interests that are adverse to the Class.

(f)      The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the party opposing the Class.

(g)      Conflicting adjudications for individual members of the Class might, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

(h)      Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy

## FURTHER SUBSTANTIVE ALLEGATIONS

### Company Background and its Poise for Growth

35.      ERT is a global technology-driven provider of services and customizable medical devices, primarily to biopharmaceutical organizations and healthcare organizations. Clinical trials use diagnostic tests to measure how a drug affects certain organs and systems to help determine the product's safety and efficacy. ERT's technology-based services improve the accuracy, timeliness and efficiency of trial set-up, data collection from sites worldwide, data interpretation and new drug, biologic and device application submissions. ERT is the market leader for centralized cardiac safety and respiratory efficacy services in drug development. ERT's cardiac safety solutions include the collection, interpretation and distribution of electrocardiographic (ECG) data and images, while ERT's respiratory solutions are used by biopharmaceutical and healthcare organizations to assess the efficacy of a drug or to evaluate compounds that have an effect on pulmonary function. ERT also collects, analyzes and

distributes electronic patient reported outcomes (ePRO) in multiple modalities across all phases of clinical research. ERT's ePRO solutions electronically capture patient self-reported data pertaining to their quality of life and are used by sponsors of clinical trials. In addition, ERT also offers site support, which includes the rental and sale of devices to support cardiac and respiratory services and ePRO, along with related supplies and logistics management.

36.     A November 3, 2011 article published on SeekingAlpha.com listed ERT as one of "3 Healthcare Stocks To Consider." The article stated:

> Recent quarterly results, highlighted by a swelling backlog of a record $343 million, set the stage for an improvement in results in 2012. "FY12 is shaping up to potentially be a double-digit revenue growth year," predict analysts at Auriga Securities. They see EPS (finally) exceeding $0.50 next year and figure if the company can hit this mark, then shares could rise up to $9, more than 75% above current levels.

37.     On February 27, 2012, the Company issued a press release announcing financial results for its fourth quarter and full year 2011, ended December 31, 2011. Among the financial highlights, the Company reported:

(a)     Net revenues were $52.3 million for the fourth quarter of 2011 compared to $48.1 million for the third quarter of 2011 and $44.9 million for the fourth quarter of 2010;

(b)     GAAP net income was $4.5 million, or $0.09 per diluted share, in the fourth quarter of 2011 compared to $4.3 million, or $0.09 per diluted share, in the third quarter of 2011 and $4.1 million, or $0.08 per diluted share, in the fourth quarter of 2010;

(c)     Cash flow from operations was $19.5 million in the fourth quarter of 2011, compared to $9.2 million in the third quarter of 2011 and $17.1 million for the fourth quarter of 2010;

(d)     New bookings were $82.5 million in the fourth quarter of 2011 compared to $78.4 million for the third quarter of 2011 and $58.9 million for the fourth quarter of 2010;

(e)     Net revenues were $184.9 million for the year ended December 31, 2011 compared to $141.0 million for the year ended December 31, 2010;

(f)     GAAP net income was $13.7 million, or $0.28 per diluted share, for the year ended December 31, 2011 compared to $9.9 million, or $0.20 per diluted share, for the year ended December 31, 2010;

(g)     Non-GAAP net income was $20.0 million, or $0.41 per diluted share, for the year ended December 31, 2011 compared to $18.4 million, or $0.37 per diluted share, for the year ended December 31, 2010;

(h)     Cash flow from operations was $42.5 million for the year ended December 31, 2011 compared to $35.9 million for the year ended December 31, 2010; and

(i)     New bookings were $303.5 million for the year ended December 31, 2011 compared to $212.2 million for the year ended December 31, 2010.

38.     In the same press release, defendant Litwin commented on the Company's strong quarter and full year, stating:

> We are pleased with the Company's results, which include record revenues and bookings for the fourth quarter and full year. This is the first quarter our bookings have ever exceeded $80 million and it marks the fourth consecutive quarter of more than $70 million in bookings. Bookings growth was driven by sustained strength in both our cardiac safety and respiratory solutions. Our continued growth shows that our message, outlining the benefits of centralization, along with the ability to purchase high quality cardiac safety, respiratory and ePRO services from one vendor is resonating with our clients.

39.     Following its strong performance in 2011, the Company expects even more growth and a stronger performance in 2012. As stated in the same February 27, 2012 press release, "ERT expects net revenues of between $195 million and $203 million for 2012. ERT

expects GAAP diluted net income per share to be between $0.40 and $0.48 for 2012 and non-GAAP diluted net income per share to be between $0.45 and $0.53 for the same period."

40.    On March 14, 2012, TheStreet.com published an article highlighting ERT's strength's, including its robust revenue growth, largely solid financial position with reasonable debt levels by most measures, growth in earnings per share, and increase in net income. The article stated:

> NEW YORK (TheStreet) **-- eResearchTechnology** (Nasdaq:ERT) has been upgraded by TheStreet Ratings from hold to buy. The company's strengths can be seen in multiple areas, such as its robust revenue growth, largely solid financial position with reasonable debt levels by most measures, growth in earnings per share, increase in net income and increase in stock price during the past year. Although no company is perfect, currently we do not see any significant weaknesses which are likely to detract from the generally positive outlook.
>
> Highlights from the ratings report include:
>
> - ERT's revenue growth has slightly outpaced the industry average of 10.5%. Since the same quarter one year prior, revenues rose by 16.5%. This growth in revenue appears to have trickled down to the company's bottom line, improving the earnings per share.
>
> - ERT's debt-to-equity ratio is very low at 0.12 and is currently below that of the industry average, implying that there has been very successful management of debt levels. To add to this, ERT has a quick ratio of 2.12, which demonstrates the ability of the company to cover short-term liquidity needs.
>
> - ERESEARCHTECHNOLOGY INC has improved earnings per share by 12.5% in the most recent quarter compared to the same quarter a year ago. The company has demonstrated a pattern of positive earnings per share growth over the past two years. We feel that this trend should continue. During the past fiscal year, ERESEARCHTECHNOLOGY INC increased its bottom line by earning $0.28 versus $0.20 in the prior year. This year, the market expects an improvement in earnings ($0.49 versus $0.28).
>
> - The net income growth from the same quarter one year ago has exceeded that of the Life Sciences Tools & Services industry average, but is less than that of the S&P 500. The net income increased by 9.9% when compared to the same quarter one year prior, going from $4.12 million to $4.53 million.

- After a year of stock price fluctuations, the net result is that ERT's price has not changed very much. Although its weak earnings growth may have played a role in this flat result, don't lose sight of the fact that the performance of the overall market, as measured by the S&P 500 Index, was essentially similar. Looking ahead, unless broad bear market conditions prevail, we still see more upside potential for this stock, despite the fact that it has already risen over the past year.

### The Proposed Transaction is Unfair

41.     In a press release dated April 10, 2012, the Company announced that it had entered into a merger agreement with Genstar, pursuant to which Genstar, through Genstar VI, Explorer and Merger Sub, will acquire all of the outstanding shares of the Company for $8.00 per share.

42.     Given the Company's recent strong performance and its positioning for growth, the Proposed Transaction consideration is inadequate and significantly undervalues the Company.

43.     As a result of the Proposed Transaction, the Company's shareholders will be cashed out at a low price while Genstar will get the full benefits of the Company's future growth. As defendant Litwin stated in the press release announcing the Proposed Transaction:

> We are pleased to announce this transaction with Genstar, whose experienced team of healthcare executives can provide strategic oversight, as well as acquisition capital, to expand the company's service offering and market opportunities. They will help position ERT to better serve our clinical research clients by continuing to fund the innovative devices and services that have made us the premier provider of health outcomes research services.

44.     Commenting on the Proposed Transaction analyst Raymond Myers of Benchmark Company stated: "eResearch Technology specializes in ECG analysis and respiratory services where it is the market leader ... It has a strong name recognition, and reputation for quality. Those are intangible assets that can be leveraged.".

45.    The Proposed Transaction consideration of $8.00 per share provides a paltry premium of just 2% based on the $7.84 closing price on April 9, 2012, the day before the Proposed Transaction was announced. The $8.00 per share consideration represents a discount to the $8.11 per share price ERT stock closed at on April 3, 2011, less than one week prior to the announcement of the Proposed Transaction.

46.    The *Public Trading Multiples Analysis* conducted by J.P. Morgan, the Company's financial advisor, yielded a value for the Company as high as $12.65 per share.

47.    The *Selected Transaction Analysis* conducted by J.P. Morgan yielded a value for the Company as high as $9.55 per share.

48.    The *Discounted Cash Flow Analysis* conducted by J.P. Morgan yielded a value for the Company as high as $8.50 per share.

49.    Further, according to Yahoo Finance, at least one Wall Street analyst had a price target of $9.00 per share before the Proposed Transaction was announced. Out of four brokers, the mean price target was $8.38 per share and the low target was $8.00, the price offered by Genstar.

50.    Accordingly, given the Company's recent strong performance, positioning for growth, the paltry premium in the Proposed Transaction, and analyst expectations, the Proposed Transaction consideration is inadequate.

### ERT's Officers and Directors Obtained Special Benefits for Themselves

51.    The Company's executive officers and directors have material conflicts of interest and are acting to better their own personal interests through the Proposed Transaction at the expense of ERT's public shareholders.

52.     First, Genstar intends to employ members of management once the Proposed Transaction is completed.  As stated in the Proxy, Genstar "has informed [the Company] that it currently intends to retain members of our management team following the merger."

53.     Second, as stated in the Proxy, Genstar intends to establish equity-based incentive compensation plans for management following the Proposed Transaction.   According to the Proxy, "Parent currently anticipates that such plan would authorize the issuance of stock options to purchase up to an aggregate of 10% of the fully diluted shares of Parent following the merger."

54.     Third, members of management will be given the opportunity to invest in the equity of the post-merger Company upon closing of the Proposed Transaction.  As stated in the Proxy:

> Genstar has discussed with Dr. Litwin the possibility that Parent may offer him and other members of management (other than Dr. Morganroth) who hold outstanding shares of our common stock immediately prior to the merger the opportunity to exchange, simultaneously with the consummation of the merger, some or all of such outstanding common stock (in lieu of the cash out and cancellation of common stock provided in the merger agreement) for shares of Parent common stock, on terms no more favorable to management than to Genstar VI and the other investors in Parent.

55.     Accordingly, while the Company's shareholders are being cashed out an unfair price, management will be able to continue to reap the benefits of ERT's growth potential.

56.     In addition, certain of the Company's officers and directors currently hold unvested stock options and/or restricted stock of the Company.  Pursuant to the terms of the Merger Agreement, such stock options and restricted stock will automatically vest, and the Company's officers and directors will be able to cash out the stock options and restricted shares in the Proposed Transaction.  The Proxy, however, fails to disclose how many restricted stock

units and unvested stock options are held by each non-employee director of the Company, and the amount they will be able to receive by cashing out such shares in the Proposed Transaction.

57.   In addition, all ERT executive officers are subject to plans or contracts that contain a severance provision applicable to a change in control. The following chart shows the amount of compensation the executive officers will receive should they be terminated without cause or resign for good reason:

| Named Executive Officer | Cash($) | Equity($) | Perquisites/ Benefits ($) | Total ($) |
|---|---|---|---|---|
| Jeffrey S. Litwin President and CEO | $1,070,894 | $745,321 | $39,435 | $1,855,650 |
| Joel Morganroth Executive VP and CSO | $580,881 | $929,805 | — | $1,510,686 |
| Keith D. Schneck Executive VP and CFO | $386,785 | $575,890 | $23,530 | $986,205 |
| Amy Furlong Executive VP and COO | $410,959 | $490,892 | $18,175 | $920,026 |
| Achim Schuelke Executive VP and CTO | $374,697 | $168,025 | $35,004 | $577,726 |
| John B. Sory Executive VP and CDO | — | | | — |

With respect to the equity column in the table above, these payments will be made regardless of whether they are terminated or resign, as seen in the following chart, which breaks down the payments as single trigger or double trigger:

| Named Executive Officer | Single Trigger | Double Trigger |
|---|---|---|
| Jeffrey S. Litwin | $745,321 | $1,110,329 |
| Joel Morganroth | $929,805 | $580,881 |
| Keith D. Schneck | $575,890 | $410,315 |
| Amy Furlong | $490,892 | $429,134 |
| Achim Schuelke | $168,025 | $409,701 |
| John B. Sory | — | — |

58.     Lastly, in connection with the execution of the Merger Agreement, on April 9, 2012, the Company entered into a consulting agreement (the "Consulting Agreement") with Joel Morganroth, M.D., P.C. (the "Consultant"), an entity owned by defendant Morganroth. The Consulting Agreement will become effective on the date the Proposed Transaction is consummated and will have a term of three years from that date. Pursuant to the terms of the Consulting Agreement, the Consultant will be paid $44,000 per month for the services Morganroth provides to the Company and will be eligible to receive additional payments of up to $251,000 per calendar year ($126,000 for calendar year ending December 31, 2012) upon the Company's attainment of certain performance goals following consummation of the Proposed Transaction. The Consulting Agreement also provides that in connection with the Proposed Transaction, the Consultant and the Company will enter into an agreement by which the assets of the Consultant will be sold to the Company upon the consummation of the Merger for $875,000 in cash.

59.     Based on the above, the Proposed Transaction reflects an effort by the Individual Defendants to aggrandize their own financial position and interests at the expense of and to the detriment of ERT's public shareholders.

### The Flawed Process and Preclusive Deal Protection Devices

60.     The Board breached their fiduciary duties by failing to adequately ensure that the Company negotiated with Genstar for the shareholders' best interests.

61.     Between January 2011 and March 2011, the Company held discussions with Genstar and received non-binding proposals from Genstar to acquire the Company. At that time, the Board decided not to pursue a sale of the Company to Genstar.

62. On June 16, 2011, Litwin and other members of management met with Genstar to discuss the acquisition of the Company, and, according to the Proxy, "management indicated to our board of directors management's belief that our board of directors should consider a proposal from Genstar should one be received."

63. Between June 2011 and October 2011, the Company held discussions with Genstar, and received a proposal from Genstar to acquire the Company for $9.00 to $11.00 per share.

64. There were obvious conflicts of interest that existed with the Company's senior management in connection with Genastar's proposal. The Company's executive officers were highly incentivized to favor a financial partner over a strategic buyer, as strategic buyers often terminate the employment of the target company's executive officers. And in fact, as described above, Genstar offered numerous benefits to the Company's executive officers, including pos-transaction employment, and the ability to retain an equity position in the post-transaction company.

65. These conflicts of interest prevented the Company from conducting an adequate sales process. Rather, for their own benefit and at the expense and to the detriment of the Company's public shareholders, the Company made a half-hearted attempt to seek out other potential acquirers, and virtually made no effort to seek out strategic parties.

66. Specifically, between October 28, 2011 and November 21, 2011, the Company, through J.P. Morgan, contacted a mere fourteen parties. Nine of the parties were financial, and only five were strategic parties. There is no indication as to the criteria used to select the strategic parties, but it appears no real effort was made to find a potentially interested strategic parties. In fact, while eight financial parties indicated interest and entered into confidentiality agreements

with the Company, not a single strategic party did. On December 7, 2011, two of the financial parties submitted proposals: Company C proposed $8.00 to $9.00 per share, and Company D proposed $7.50 to $8.00 per share. On December 19, 2011, Genstar submitted a revised proposal of $7.60 per share based on changes in management's financial projections. By February 9, 2012, Company C determined not to continue with the process and Company D was not actively engaged in the process.

67.     However, rather than broaden the sales process, and contact additional parties, the Company's insiders focused solely on negotiating a deal with Genstar, a deal which, as described above, led to numerous financial benefits to the Company's officers and directors.   On February 20, 2012, the Company entered into an exclusivity agreement with Genstar, agreeing to negotiate with Genstar exclusively for 37 days and to reimburse Genstar's expenses should the Company not enter into a definitive merger agreement with Genstar. The Company extended the exclusivity agreement twice, negotiating exclusively with Genstar until April 9, 2012 when it executed the Merger Agreement.

68.     In addition, as part of the Merger Agreement, the Individual Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Company.

69.     Section 6.03(b) of the Merger Agreement includes a "no solicitation" provision barring the Company from soliciting interest from other potential acquirers in order to procure a price in excess of the amount offered by Explorer.  Section 6.03(a) demands that the Company terminate any and all prior or on-going discussions with other potential acquirers, and § 6.03(d) includes a provision whereby ERT will not waive a standstill agreement.

70.     Pursuant to § 6.03(d) of the Merger Agreement, should an unsolicited bidder submit a competing proposal, the Company must notify Explorer of the bidder's identity and the terms of the bidder's offer.   Pursuant to Section 6.03(d), should the Board determine that the unsolicited offer is superior, before the Company can terminate the Merger Agreement with Explorer in order to enter into the competing proposal, it must grant Explorer four business days in which the Company must negotiate in good faith with Explorer (if Explorer so desires) and allow Explorer to amend the terms of the Merger Agreement to make a counter-offer so that proposal "no longer constitutes a Superior Proposal."   In other words, the Merger Agreement gives Explorer access to any rival bidder's information and allows Explorer a free right to top any superior offer simply by matching it.   Accordingly, no rival bidder is likely to emerge and act as a stalking horse, because the Merger Agreement unfairly assures that any "auction" will favor Genstar and piggy-back upon the due diligence of the foreclosed second bidder.

71.     The Merger Agreement also provides that a termination fee of $11 million must be paid to Explorer by ERT if the Company decides to pursue the competing offer, thereby essentially requiring that the competing bidder agree to pay a naked premium for the right to provide the shareholders with a superior offer.

72.     Ultimately, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.   The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

***The Proxy is False and Misleading***

73.     Defendants are withholding material information about the Proposed Transaction from ERT's public shareholders.  The Proxy, which recommends that ERT shareholders vote in favor of the Proposed Transaction, contains numerous material omissions and misstatements, in contravention of the Board's duty of candor and full disclosure and in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

**Disclosures Concerning the Company's Financial Forecasts**

74.     The Proxy fails to disclose material information concerning the financial forecasts of ERT that were prepared by ERT's management and used by J.P. Morgan in its various financial analyses. Specifically, the Proxy should disclose (a) the free cash flow forecasts of the Company for fiscal years 2012 through 2014, (b) the line items necessary to calculate the free cash flow forecasts, and (c) the extrapolated projections for fiscal years 2015 through 2021.

**Disclosures Related to J.P. Morgan's Financial Analyses and Opinion Regarding the Value of the Company**

75.     The Proxy also fails to disclose certain data and inputs underlying the financial analyses supporting the fairness opinion of the Board's financial advisor, J.P. Morgan, including:

(a)     with respect to the *Public Trading Multiples Analysis*, the criteria used to determine which companies were deemed comparable to ERT and thus selected for use in the analysis, as well as the multiples observed for each company in the analysis;

(b)     with respect to the *Selected Transactions Analysis*, the criteria used to select the transactions used in the analysis, the multiples observed for each transaction in the analysis, and the reasons J.P. Morgan used to select the LTM P/E multiple range of 18.5x to 22.5x and the LTM EBITDA multiple range of 7.0x to 10.0x;

(c)    with respect to the *Selected Transactions Analysis*, the reasons that J.P. Morgan applied a narrower LTM P/E multiple range to the Company's LTM P/E of 18.5x to 22.5x than that calculated by J.P. Morgan of 18.4x to 32.7x;

(d)    with respect to the *Selected Transactions Analysis*, the reasons that J.P. Morgan applied a narrower LTM EBITDA multiple range to the Company's LTM EBITDA of 7.0x to 10.0x than that calculated by J.P. Morgan of 18.4x to 32.7x; and

(e)    with respect to the *Discounted Cash Flow Analysis*, the criteria used to select the unlevered free cash flow perpetual growth rates of 2.0% to 3.0%; the Company's weighted average cost of capital estimate calculated by J.P. Morgan that was used in selecting the discount rate range of 11.0% to 12.0%; and the key inputs used to calculate the Company's weighted average cost of capital.

### Disclosures Concerning the Interests of the Company's Officers and Directors in the Proposed Transaction

76.    The Proxy fails to disclose material information concerning the interests of the Company's officers and directors in the Proposed Transaction. In particular, the Proxy:

(a)    Fails to disclose when Genstar first informed management that it intended to retain members of management, and the dates and nature of any discussions regarding the intent to retain management;

(b)    Fails to disclose when Genstar "discussed with Dr. Litwin" that Genstar intended to provide equity-based compensation to those retained members of management, and the dates and nature of any discussions regarding the equity-based compensation;

(c)    Fails to disclose when Genstar first informed management that management would be allowed to exchange shares of ERT for shares of the post-merger

23

company's common stock, and the dates and nature of any discussions regarding management's ability to invest in the post-merger company;

(d)     Fails to disclose whether Companies A through E indicated their intent to retain management after an acquisition, provide equity-based compensation to such retained members of management, or allow management to invest in the post-transaction company, and the dates and nature of any such discussions; and

(e)     Fails to disclose how many unvested stock options and restricted shares are held by each non-employee director of the Company, as well the amount each director would receive by cashing out such shares in the Proposed Transaction.

**Disclosures Concerning the Events Leading Up to the Announcement of the Proposed Transaction**

77.     The Proxy fails to disclose material information pertaining to the events leading up to the announcement of the Proposed Transaction. In particular, the Proxy:

(a)     Fails to disclose how, in January 2011, the meeting between defendant Morganroth and Genstar came about and who at Genstar he met with;

(b)     Fails to disclose why, in March 2011, the Board decided not to pursue a proposed transaction with Genstar;

(c)     Fails to disclose the reasons given by Company A not to submit a proposal to acquire the Company;

(d)     Fails to disclose the members of senior management that met with Genstar in Philadelphia on June 16, 2011;

(e)     Fails to disclose the member of the Board contacted by Company B on June 24, 2011;

(f)     Fails to disclose what other strategic options, in addition to a sale of the Company. the Board considered in the meetings on October 24 and 25. 2011:

(g)     Fails to disclose whether the Special Committee considered other legal and financial advisors to assist with the evaluation of the Company and a sale of the Company;

(h)     Fails to disclose who provided the list of potential strategic and financial parties to J.P. Morgan, the criteria used to select the parties, the reasons for selecting only five strategic parties to contact and the criteria used to select those five strategic parties;

(i)     Fails to disclose why the financial projections had changed between August 2011 and November 2011;

(j)     Fails to disclose which members of the Company's senior management met with representatives on Genstar on December 7, 2011;

(k)     Fails to disclose why the Company agreed to extend the exclusivity and reimbursement agreement with Genstar twice;

(l)     Fails to disclose the reason(s) Company's C, D and E elected not to continue with the process;

(m)     Fails to disclose the conclusions the Board reached and why it decided not to pursue other the other strategic alternatives considered;

(n)     Details concerning the proposed terms for defendant Morganroth's consulting agreement discussed by the Special Committee on or about March 25, 2012 and why the committee concluded they were reasonable;

(o)     Fails to disclose the compensation J.P. Morgan earned from Genstar and ERT for the previous work done for both companies as described in the fairness opinion; and

(p)    Fails to disclose the financial analysis of the Proposed Transaction provided to the Board by J.P. Morgan on April 5, 2012.

78.    Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of Section 14(a) of the Exchange Act
### and Rule 14a-9 Promulgated Thereunder

79.    Plaintiff brings this claim individually on behalf of himself.

80.    Plaintiff repeats all previous allegations as if set forth in full herein.

81.    Defendants have issued the Proxy with the intention of soliciting shareholder support of the Proposed Transaction.

82.    Rule 14a-9, promulgated by SEC pursuant to Section 14(a) of the Exchange Act provides that a proxy statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

83.    Specifically, the Proxy violates the Section 14(a) and Rule 14a-9 because it omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants should have known that the Proxy is materially misleading and omits material facts that are necessary to render them non-misleading.

84.    The misrepresentations and omissions in the Proxy are material to Plaintiff, as well as the Company's other public shareholders, and Plaintiff and other shareholders will be

deprived of their entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

## COUNT II
### Breach of Fiduciary Duties
### (Against All Individual Defendants)

85.     Plaintiff repeats all previous allegations as if set forth in full herein.

86.     The Individual Defendants have knowingly and recklessly and in bad faith violated fiduciary duties of care, loyalty, good faith, independence and candor owed to the public shareholders of ERT and have acted to put their personal interests ahead of the interests of ERT shareholders.

87.     The Individual Defendants' recommendation of the Proposed Transaction will result in change of control of the Company which imposes heightened fiduciary responsibilities to maximize ERT's value for the benefit of the stockholders and requires enhanced scrutiny by the Court.

88.     The Individual Defendants have breached their fiduciary duties of loyalty, good faith, independence and candor owed to the shareholders of ERT because, among other reasons:

(a)     they failed to take steps to maximize the value of ERT to its public shareholders and took steps to avoid competitive bidding;

(b)     they failed to properly value ERT; and

(c)     they ignored or did not protect against the numerous conflicts of interest resulting from the directors' own interrelationships or connection with the Proposed Transaction.

89.     As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of ERT's assets and will be prevented from benefiting from a value-maximizing transaction.

90.   Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Transaction, to the irreparable harm of the Class.

91.   Plaintiff and the Class have no adequate remedy at law.

## COUNT III
### Breach of Fiduciary Duty -- Disclosure
### (Against Individual Defendants)

92.   Plaintiff repeats all previous allegations as if set forth in full herein.

93.   The fiduciary duties of the Individual Defendants in the circumstances of the Proposed Transaction require them to disclose to Plaintiff and the Class all information material to the decisions confronting ERT's shareholders.

94.   As set forth above, the Individual Defendants have breached their fiduciary duty through materially inadequate disclosures and material disclosure omissions.

95.   As a result, Plaintiff and the Class members are being harmed irreparably.

96.   Plaintiff and the Class have no adequate remedy at law.

## COUNT IV
### Aiding and Abetting
### (Against ERT, Genstar, Genstar VI, Explorer, and Merger Sub)

97.   Plaintiff repeats all previous allegations as if set forth in full herein.

98.   As alleged in more detail above, Defendants ERT, Genstar, Genstar VI, Explorer, and Merger Sub have aided and abetted the Individual Defendants' breaches of fiduciary duties.

99.   As a result, Plaintiff and the Class members are being harmed.

100.   Plaintiff and the Class have no adequate remedy at law.

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

(A)     declaring this action to be a class action and certifying Plaintiff as the Class representatives and his counsel as Class counsel;

(B)     declaring that the Proxy is materially misleading and contains omissions of material fact in violation of Section 14(a) of the Exchange and Rule 14a-9 promulgated thereunder;

(C)     enjoining, preliminarily and permanently, the Proposed Transaction;

(D)     in the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

(E)     directing that Defendants account to Plaintiff and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties;

(F)     awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(G)     granting Plaintiff and the other members of the Class such further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

The plaintiff respectfully demands trial by jury on all issues so triable.

May 18, 2012

LEVI & KORSINSKY, LLP
Shannon L. Hopkins, Esq.
Allen Schwartz, Esq.
30 Broad Street, 24th Floor
New York, New York 10004
Tel: (212) 363-7500
Fax: (212) 363-7171
Attorneys for plaintiff
VINCENT P. ANGIOLILLO

Vincent Coppola, Esquire
Penn. Attorney #50181

Pribanic & Pribanic
513 Court Place
Pittsburgh, PA 15219
(412) 281-8844
(412) 281-4740 (fax)